IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 123,203

In the Matter of MARK G. AYESH,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed May 7, 2021. Three-year suspension with a possibility to be placed on probation after six months upon approval of a probation plan.

*Stanton A. Hazlett*, Disciplinary Administrator, argued the cause, and *Deborah L. Hughes*, Deputy Disciplinary Administrator, was with him on the brief for petitioner.

*David M. Rapp,* of Hinkle Law Firm, LLC, of Wichita, and *Michael D. Hepperly*, of Michael D. Hepperly Law Office, Chtd., of Wichita, argued the cause and were on the brief for respondent. *Mark G. Ayesh*, respondent, argued the cause pro se.

PER CURIAM: This is a contested attorney discipline proceeding against Mark G. Ayesh, of Wichita, Kansas, who was admitted in 1979 to practice law in the state of Kansas. A panel of the Kansas Board for Discipline of Attorneys unanimously concluded in a 126-page report that Ayesh violated the Kansas Rules of Professional Conduct in two separate professional engagements resulting in two disciplinary complaints. The first arose from sprawling and acrimonious litigation in a series of disputes among residents of a Wichita condominium development, its governing association, and maintenance contractors. The second complaint—factually unrelated to the first—arose from a real estate transfer to avoid a tax lien in which Ayesh forged his clients' names to two warranty deeds, notarized their signatures, and filed the documents with the register of deeds.

1

Ayesh stipulates to the facts and admits violating KRPC 1.2 (scope of representation) (2021 Kan. S. Ct. R. 323); KRPC 1.6 (confidentiality) (2021 Kan. S. Ct. R. 330); KRPC 1.7 (conflict of interest: current clients) (2021 Kan. S. Ct. R. 336); KRPC 1.8 (conflict of interest: current clients) (2021 Kan. S. Ct. R. 345); KRPC 1.9 (conflict of interest: former clients) (2021 Kan. S. Ct. R. 352); KRPC 1.16 (termination of representation) (2021 Kan. S. Ct. R. 372); KRPC 3.1 (meritorious claims and contentions) (2021 Kan. S. Ct. R. 384); KRPC 3.3 (candor to the tribunal) (2021 Kan. S. Ct. R. 385); KRPC 4.1 (truthfulness in statements to others) (2021 Kan. S. Ct. R. 397); KRPC 8.3 (failure to report misconduct) (2021 Kan. S. Ct. R. 426); KRPC 8.4(c) (engaging in dishonest conduct) (2021 Kan. S. Ct. R. 427); and KRPC 8.4(d) (conduct prejudicial to the administration of justice) (2021 Kan. S. Ct. R. 427).

What remains contested focuses on the aggravating and mitigating factors leading to the panel's recommendation for a one-year suspension. Ayesh argues the panel gave insufficient weight to his mitigation evidence and asks to remain a practicing attorney under probation with supervision. He alternatively suggests a suspension not exceeding 90 days with a practice supervision plan after that. The Disciplinary Administrator's office endorses the panel's findings, but at oral argument recommended a six-month suspension coupled with a reinstatement hearing to ensure Ayesh's health concerns will not adversely impact resuming his law practice. We hold the circumstances warrant a more stringent approach to discipline.

We accept the panel's findings and conclusions, which we hold are supported by clear and convincing evidence. We suspend Ayesh from practicing law in this state for a period of three years, while granting him the possibility for probation after six months upon approval by the Disciplinary Administrator's office of a probation plan for the remaining suspension period, all to be followed by a reinstatement hearing once Ayesh completes the three-year term.

FACTUAL AND PROCEDURAL BACKGROUND

On March 8, 2019, the Office of the Disciplinary Administrator initiated this disciplinary action against Ayesh, who timely answered. As the proceeding progressed, Ayesh stipulated to the facts in a document spanning 82 pages regarding the two disciplinary complaints. He also stipulated to various disciplinary code violations.

On December 10, 2019, the hearing panel began a two-day hearing on the complaints. It issued a 126-page formal report with its findings and recommendations. That report can be condensed to some extent, so it is not fully recited below to keep the attention on what remains contested.

*Condominium litigation violations*

The condominium litigation complaint, denoted as DA 12,111, involved the Cedar Lakes Village Condominium Association (CLVCA); Cross Real Estate Management (CREM), which was CLVCA's management company from 2008 through 2011; Simon Palmer Properties, CLVCA's replacement management company after CREM; Jon Frobish, the complainant and a condominium resident; and Jerry Berg, another condominium resident.

In April 2011, Berg had a physical altercation with Frobish, who had a consultant agreement with CREM to be the development's property manager. Berg sued Frobish for assault and battery and sought to hold CLVCA and CREM vicariously liable for Frobish's conduct. Berg also made other claims against the defendants, who hired Ayesh to represent them all. There was no engagement letter. The panel noted:

"Even though the possible conflict was discussed, Ayesh did not document the discussion in writing; did not obtain written waivers from his clients to any conflict; did not obtain Frobish's written informed consent to a limited-scope representation; and did not advise his clients of the effect of common representation on client-lawyer confidentiality and the attorney-client privilege."

The assault and battery case was removed to federal court where Ayesh filed a counterclaim for injunctive relief against Berg. That case was remanded to state court after the federal court granted defendants summary judgment on Berg's federal cause of action.

Four other lawsuits involving the parties were filed while that federal litigation was pending. In April 2013, Berg sued Ayesh, CLVCA, Simon Palmer Properties, and Frobish in federal court. Ayesh again appeared as counsel for all defendants. In June 2014, Frobish sued CLVCA and Simon Palmer Properties for access to documents. Ayesh appeared as counsel for those defendants. In July 2014, Berg sued Ayesh, Frobish, and CLVCA concerning a no-contact list. Ayesh represented all defendants except Frobish in that matter. And in November 2014, Ayesh was plaintiffs' counsel in a lawsuit that two CLVCA board members brought against Frobish to prevent a meeting to vote on bylaw changes and decide whether to discharge Ayesh.

The stipulated disciplinary violations in the condominium litigation revolve primarily around Ayesh's handling of the conflicting interests with his clients (Frobish, CLVCA, and CREM) concerning Berg's assault and battery claim; and to a lesser extent pleadings Ayesh prepared and filed containing improper, unsubstantiated allegations about Berg. For example, the conflict of interest between Frobish and the others regarded their potential liability for Frobish's confrontation with Berg which existed from the litigation's outset.

4

This conflict was particularly evident at the summary judgment stage when Frobish refused to swear in an affidavit he was not acting in the course of his consulting employment during the confrontation with Berg, so Ayesh secured affidavits from others to advance that fact. On another occasion, Frobish pointed out the conflict privately to Ayesh, who responded by calling him an "idiot." And when Ayesh finally withdrew as Frobish's attorney, Ayesh remained as counsel for the other defendants and sent an e-mail to them criticizing and personally attacking Frobish. In doing so, Ayesh disclosed information about his representation of Frobish to the others. Ayesh also misrepresented that the conflict did not arise with Frobish until Frobish became upset by not being elected to the CLVCA board, and claimed Frobish only asserted the conflict because he was "emotionally crushed." Similarly, Ayesh filed multiple pleadings containing name-calling and unsubstantiated allegations concerning Berg—referring to Berg as having "psychopathic tendencies," describing him as "the condo terrorist," contending that "it is believed [Berg] once shot his neighbor's dog," and suggesting Berg was responsible for burning down the Cedar Lakes Village clubhouse.

With respect to all this, the hearing panel concluded:

"KRPC 1.2(c)

"25.     The respondent stipulated that he violated KRPC 1.2(c).

"26.     KRPC 1.2(c) provides that a 'lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent in writing.'

"27.     The respondent failed to obtain Mr. Frobish's informed consent in writing to the limited-scope representation. The hearing panel concludes that the respondent violated KRPC 1.2(c).

5

"KRPC 1.6

"28.    The respondent stipulated that he repeatedly violated KRPC 1.6.

"29.    With certain limited exceptions, 'a lawyer shall not reveal information relating to representation of a client unless the client consents after consultation.' KRPC 1.6(a). Specifically, KRPC 1.6 provides:

'(a)    A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).

'(b)    A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

(1)    To prevent the client from committing a crime;

(2)    to secure legal advice about the lawyer's compliance with these Rules;

(3)    to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client;

(4)    to comply with other law or a court order; or

(5)    to detect and resolve conflicts of interest arising from the lawyer's change of employment or from changes in the composition or ownership of a firm, but only if the revealed

6

information would not compromise the attorney-client privilege or otherwise prejudice the client.'

"30.    The respondent repeatedly improperly revealed confidential information:

a.    The respondent revealed more confidential information in the April 15, 2014, position statement than was reasonably necessary to respond to allegations concerning his representation and the conflict of interest.

b.    The respondent revealed more confidential information in the April, 2014, email message to the court than was reasonably necessary to respond to the allegations concerning his representation.

c.    The respondent revealed more confidential information in the April 28, 2014, position statement than was reasonably necessary to respond to allegations concerning his representation.

d.    The respondent revealed more confidential information in the July 25, 2014, reply to the motion for reconsideration than was reasonably necessary to defend himself.

e.    The respondent revealed more confidential information in the November 12, 2014, response to the motion to strike than was reasonably necessary to defend himself.

f.    The respondent revealed more confidential information in the November 12, 2014, response to a motion for sanctions than was reasonably necessary to defend himself.

g.    The respondent revealed more confidential information in the November 17, 2014, response to motion to vacate temporary

restraining order and to remove the respondent as counsel than was reasonably necessary to defend himself.

h.      The respondent revealed more confidential information in the December 3, 2014, responses to the motions for sanctions than was reasonably necessary to defend himself.

i.      The respondent revealed more confidential information in the December 30, 2014, response to the motion to disqualify the respondent as counsel than was reasonably necessary to defend himself.

j.      The respondent revealed more confidential information in the December 30, 2014, response to motion for sanctions than was reasonably necessary to defend himself.

k.      The respondent revealed more confidential information in the April 6, 2015, response to the motion to recuse Judge Dahl than was reasonably necessary to respond to the allegations contained in the motion.

"The hearing panel concludes that the respondent repeatedly violated KRPC 1.6.

"KRPC 1.7

"31.    The respondent stipulated that he violated KRPC 1.7.

"32.    KRPC 1.7 provides:

'(a)    Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1)    the representation of one client will be directly adverse to another client; or

8

(2)     there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

'(b)     Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1)     the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2)     the representation is not prohibited by law;

(3)     the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4)     each affected client gives informed consent, confirmed in writing.'

"33.     The rules do not permit the respondent to represent clients with conflicting interests without taking certain steps. The respondent failed to take the steps required by KRPC 1.7(b) and, as a result, repeatedly violated KRPC 1.7(a), as follows:

a.     The respondent engaged in a conflict of interest by representing Mr. Frobish and CREM, CLVCA, and Simon Palmer Properties when Mr. Frobish's interests were in conflict with the remaining defendants. Mr. Frobish made it clear that his position was that he was acting within the scope of his employment during the pry bar incident. Despite the conflict of interest, the respondent failed to comply with KRPC 1.7(b).

9

b.     By undertaking the joint representation of himself and the other defendants in *Berg vs. Ayesh*, et al., case number 13-CV-1164, there was a substantial risk that the representation of one or more of the respondent's clients would be materially limited by a personal interest of the respondent. Again, the respondent did not comply with KRPC 1.7(b) regarding this conflict.

c.     The respondent included defenses and issues in a proposed pretrial order which disadvantaged his client, Mr. Frobish. As a result of the defenses and issues in the proposed pretrial order, there was a substantial risk that the representation of Mr. Frobish would be materially limited by the respondent's responsibilities to the other defendants. The respondent failed to comply with KRPC [1.7(b)].

d.     In conjunction with a motion for summary judgment, the respondent prepared affidavits for [G.F.], [C.B.], and Mr. Frobish to sign to establish that Mr. Frobish was not acting within the scope of his employment. Mr. Frobish refused to sign the affidavit because he contended that he was acting within the scope of his employment. [G.F.] and [C.B.] signed affidavits that Mr. Frobish was not acting within the scope of his employment. Clearly, the respondent knew there was a conflict of interest when Mr. Frobish refused to sign the affidavit. Despite this knowledge, the respondent failed to comply with KRPC 1.7(b).

e.     Mr. Frobish sought advice from the disciplinary administrator regarding the pending litigation. Mr. Frobish presented Mr. Hazlett with a description of relevant facts regarding the respondent's representation of Mr. Frobish and the other defendants. Mr. Hazlett indicated that there were potential conflicts of interest. Mr. Frobish forwarded Mr. Hazlett's response to the respondent. Despite receipt of Mr. Hazlett's assessment of the situation, the respondent took no action to rectify the situation as required by KRPC 1.7(b).

f.    After the case was remanded to state court, the respondent filed an additional motion for summary judgment. In the state court motion for summary judgment, the respondent continued to argue that Mr. Frobish was not acting within the scope of his employment. The respondent's position regarding this issue is evidence of an ongoing conflict of interest in the respondent's representation of Mr. Frobish and the other defendants. Despite the conflict of interest, the respondent failed to comply with KRPC 1.7(b).

"As such, the hearing panel concludes that the respondent repeatedly violated KRPC 1.7(a)(2).

"KRPC 1.8

"34.    The respondent stipulated that he violated KRPC 1.8.

"35.    Lawyers are not permitted to:

'. . . accept compensation for representing a client from [someone] other than the client, unless [. . . ]:

'(1)    the client gives informed consent;

'(2)    there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and

'(3)    information relating to representation of a client is protected as required by Rule 1.6.' KRPC 1.8(f).

11

"36. In this case, the respondent failed to obtain Mr. Frobish's informed consent to accept compensation from CLVCA and CREM for representing Mr. Frobish. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.8(f).

"KRPC 1.9

"37. The respondent stipulated that he repeatedly violated KRPC 1.9.

"38. KRPC 1.9 prohibits attorneys from engaging in conflicts of interest regarding former clients:

'(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

. . . .

'(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.'

12

"39.	On April 7, 2014, the respondent terminated his representation of Mr. Frobish. After terminating his representation of Mr. Frobish and without first obtaining Mr. Frobish's written consent, the respondent continued to represent the other defendants with interests materially adverse to Mr. Frobish. The hearing panel concludes that the respondent repeatedly violated KRPC 1.9.

"KRPC 1.16(a)(1)

"40.	The respondent stipulated that he violated KRPC 1.16.

"41.	In certain circumstances, attorneys must withdraw from representing a client. KRPC 1.16 provides:

'(a)	Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:

(1)	the representation will result in violation of the rules of professional conduct or other law.'

"42.	The respondent was obligated to withdraw from the representation of all defendants when the conflict between Mr. Frobish and the other defendants became known. Clearly, the respondent knew of the conflict by August, 2013, when Mr. Frobish refused to sign the affidavit. Further, the respondent should have recognized the potential for a conflict prior to that time as Mr. Berg asserted in the pleadings that Mr. Frobish was acting in the scope of his employment. The respondent's continued representation of the remaining defendants resulted in a violation of KRPC 1.7 and KRPC 1.9. The hearing panel concludes that the respondent violated KRPC 1.16(a)(1) by failing to withdraw from the representation of the other defendants.

"KRPC 3.1

"43.	The respondent stipulated that he violated KRPC 3.1.

13

"44.    Attorneys are prohibited from bringing or defending a proceeding unless there is a basis for doing so that is not frivolous. KRPC 3.1.

"45.    On December 30, 2014, the respondent filed a response to a motion for sanctions. In the response, the respondent failed to respond to the allegations in the motion, rather the respondent included immaterial and irrelevant information that amounted to an attack on Mr. Frobish. Additionally, the court concluded that the respondent's response lacked good faith and was unnecessary to the merits of the motion. The hearing panel concludes that the respondent violated KRPC 3.1.

"KRPC 3.3

"46.    The respondent stipulated that he repeatedly violated KRPC 3.3.

"47.    The foundation of the practice of law is truth. Attorneys must be honest in all they do, particularly in appearances before courts. 'A lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer.' KRPC 3.3(a)(1).

"48.    The respondent repeatedly made false statements of material fact to the court and failed to correct those false statements of material fact made to the court, as follows:

a.    On May 5, 2014, the respondent filed a response which misrepresented how and when the conflict of interest arose. The respondent failed to correct the false statement with the court.

b.    On July 25, 2014, the respondent filed a reply to Mr. Frobish's motion for reconsideration. In the reply, the respondent continued to make assertions that misrepresented the timing of the conflict, in violation of KRPC 3.3(a)(1). The respondent failed to correct the false statement with the court.

14

c.      On November 12, 2014, the respondent filed a response to Mr. Frobish's motion to strike. In the response, the respondent made unsupported allegations regarding Mr. Frobish's motivation. The respondent took no steps to correct the false statement with the court.

d.      On November 12, 2014, the respondent filed a response to Mr. Frobish's motion for sanctions. In the response, the respondent included many of the same misrepresentations that he had previously made in the response to the motion to strike. The respondent did not correct the false statement with the court.

e.      On November 17, 2014, the respondent filed a response to Mr. Frobish's motion to vacate the temporary restraining order. Characterizing Mr. Frobish as a 'turncoat,' in the response, the respondent falsely stated that Mr. Frobish changed his mind and claimed that he was acting in the scope of his employment. Again, the respondent did not correct his false statement.

f.      On December 3, 2014, the respondent filed responses to Mr. Frobish's motions for sanctions. In the responses, the respondent falsely claimed that Mr. Frobish created the conflict in the 11th hour. The respondent knew that Mr. Frobish made his position clear by August, 2013. The respondent failed to correct the false statement made to the court in the responses.

g.      On December 30, 2014, the respondent filed a response to Mr. Frobish's motion to disqualify the respondent as counsel for CLVCA. In the response, the respondent falsely stated that Mr. Frobish did not claim to have been acting in the scope of his employment until one week before trial. The respondent did not correct the false statement.

h.      Also on December 30, 2014, the respondent filed a response to Mr. Frobish's motion for sanctions. In the response, the respondent attacked Mr. Frobish with the same statements made above. The respondent took no actions to correct the false statements.

i.      On April 6, 2015, the respondent filed a response to Mr. Frobish's motion to recuse Judge Dahl. In the response, the respondent engaged in name-calling, falsely accused Mr. Frobish of creating a bogus conflict of interest and falsely accused Mr. Frobish of filing a frivolous ethics complaint with the disciplinary administrator's office.

j.      On June 4, 2015, the respondent filed a reply to Mr. Frobish's response to the respondent's motion to reconsider. In the reply, the respondent continued to misrepresent the timing of the conflict of interest raised by Mr. Frobish.

"The hearing panel concludes that the respondent repeatedly violated KRPC 3.3(a)(1).

. . . .

"KRPC 8.4(d)

"58.    The respondent stipulated that he repeatedly violated KRPC 8.4(d).

"59.    'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d).

"60.    The respondent engaged in conduct that was prejudicial to the administration of justice as follows:

a.      On June 26, 2014, the respondent filed a motion for reconsideration of sanctions and on July 25, 2014, the respondent filed a

16

reply to Mr. Frobish's response to the motion for reconsideration of sanctions. Despite having been previously sanctioned for engaging in intentional and malicious name-calling and making assertions not supported by evidence, the respondent engaged in the same conduct in the motion and in the reply.

b. On November 12, 2014, the respondent filed a response to Mr. Frobish's motion to strike. In the motion to strike, the respondent attacked his former client, engaged in name-calling, and made assertions that were not supported by evidence.

c. On November 12, 2014, the respondent also filed a response to Mr. Frobish's motion for sanctions. Again, the respondent continued to attack his former client, engage in name-calling, and make assertions not supported by evidence.

d. On November 17, 2014, the respondent filed a response to Mr. Frobish's motion to vacate the temporary restraining order and to remove the respondent as counsel. In the response, the respondent continued to engage in similar conduct.

e. On December 3, 2014, the respondent filed responses to Mr. Frobish's motions for sanctions. In the responses to the motions for sanctions, the respondent, again, continued the same conduct.

f. On December 22, 2014, the respondent filed a counterclaim against Mr. Berg. In the counterclaim, the respondent included many of the same allegations that the court found improper and resulted in a sanction against the respondent's clients.

g. On December 30, 2014, the respondent filed a response to Mr. Frobish's motion to disqualify the respondent as counsel for

17

CLVCA. In the responses, the respondent attacked Mr. Frobish with the same statements he made in previous filings.

        h.        On December 30, 2014, the respondent filed a response to Mr. Frobish's motion for sanctions. Again, the respondent attacked Mr. Frobish by calling him names and making assertions that were not supported by evidence.

        i.        On April 6, 2015, the respondent filed a response to Mr. Frobish's motion to recuse Judge Dahl. In the response, the respondent falsely accused Mr. Frobish of creating a bogus conflict of interest and filing a frivolous disciplinary complaint.

"As such, the hearing panel concludes that the respondent continued to violate KRPC 8.4(d) in many ways for an extended period of time. The respondent's 'bad faith allegations . . . reflecting improper motive' as found by Judge Gale in July of 2013 continued to be observed in December of 2013 by Judge Vratil, adopted by Judge Yost in June of 2014, and Judge Wooley in April of 2015. The conclusions and findings of each judge appeared to have no impact on the conduct of the respondent."

*Deed transactions violations*

The deed transactions complaint, denoted as DA 12,700, involved Ayesh assisting a married couple with unpaid tax liabilities the husband incurred before the marriage. Over an eight-year period, Ayesh worked with the couple "on tax avoidance through series of transactions that involved transferring real property out of his clients' names to protect them from levy and execution." In November 2011, Ayesh signed his clients' names on two warranty deeds, each transferring 80 acres solely to the wife. Ayesh notarized both deeds, "falsely certifying" his clients "signed the deeds in his presence," and recorded them. Ayesh sent the recorded deeds to the clients with a note indicating he had taken "'the liberty of signing your name to expedite the transfers.'"

When the couple later divorced, the husband challenged the deeds' authenticity. His counsel contacted Ayesh, who admitted notarizing the deeds outside the couples' presence but denied signing them. Ayesh later represented to the Disciplinary Administrator's office that he learned the truth only after retrieving the file from storage. He said he believed he had authority to sign the deeds on the clients' behalf.

The panel concluded from this:

"KRPC 4.1

"49.  The respondent stipulated that he violated KRPC 4.1.

"50.  Attorneys are required to be honest in dealings with third persons:  '[i]n the course of representing a client a lawyer shall not knowingly . . . make a false statement of material fact or law to a third person.' KRPC 4.l(a).

"51.  The respondent made a false statement of material fact when he signed his clients' names to the deeds, when he notarized the forged signatures, and when he filed the deeds with the Montgomery County Register of Deeds. The hearing panel concludes that the respondent violated KRPC 4.l(a).

"KRPC 8.3

"52.  The respondent stipulated that he violated KRPC 8.3.

"53.  Attorneys are required to report misconduct. 'A lawyer having knowledge of any action, inaction, or conduct which in his or her opinion constitutes misconduct of an attorney under these rules shall inform the appropriate professional authority.' KRPC 8.3(a).

19

"54.     The respondent knew it was attorney misconduct to sign his clients' names to the deeds, to notarize the forged signatures, and to file the deeds with the Montgomery County Register of Deeds, yet, the respondent failed to report his misconduct. The hearing panel concludes that the respondent violated KRPC 8.3(a).

"KRPC 8.4(c)

"55.     The respondent stipulated that he violated KRPC 8.4(c).

"56.     'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c).

"57.     The respondent engaged in conduct that involved dishonesty when he signed his clients' names to the deeds, when he notarized the forged signatures, and when he filed the deeds with the Montgomery County Register of Deeds on two occasions. As such, the hearing panel concludes that the respondent violated KRPC 8.4(c)."

*Ayesh's mitigation case and the hearing panel's recommendation*

Because he stipulated to his misconduct and the disciplinary violations, Ayesh was the only party to present witnesses at the panel hearing. He focused on mitigation. He presented more than 50 supporting letters and testimony from two CLVCA board members from the time of the condominium litigation; District Judge Eric Yost, who presided over some of the condominium litigation; retired District Judge Robert Schmisseur; retired federal magistrate judge Karen Humphreys; Dr. Peter Graham, a clinical psychologist; Father Paul O'Callaghan; Wichita attorney James Walker, who had agreed at that time to supervise the proposed probation plan; and himself.

CLVCA board members, Almer J. Mandt and Cheryl Hinshaw, described Ayesh favorably and testified about Berg and Frobish's character. Both described Berg's litigiousness and abusive conduct toward themselves and other residents. Retired judge

Schmisseur described Ayesh as professional, honest, and ethical. He said Berg is a bully who brings out the worst in everybody. Retired federal magistrate Humphreys testified Ayesh could not have a better reputation and was probably the only lawyer who would have undertaken a vigorous representation of the Cedar Lakes Village residents. She believed he should be allowed to continue practicing. She characterized the CLVCA case as a wildfire destroying everything in its path. She agreed disciplinary punishment was in line but thought probation appropriate.

Judge Yost, who ordered Ayesh to withdraw from a case and imposed sanctions, testified Ayesh is an honest person and honest attorney. He said Ayesh's courtroom demeanor was appropriate during the case. And when asked if there was a reason for his removing Ayesh that was not evident from the journal entry, he said he "thought that [Ayesh] had gotten too sucked in to the Berg vortex and . . . too invested in" the case. Yost said Ayesh is compassionate and that it would diminish the bar to lose him. He agreed with Ayesh's counsel that Frobish "contributed mightily" to the problems that brought the litigation on. Among them, he said, was that Frobish seemed to "switch sides" after losing the board election. Father Paul O'Callaghan, dean of St. George Orthodox Christian Cathedral in Wichita, said Ayesh is "very very intense and . . . deeply committed to" his charitable endeavors, and was his "go-to" for attorneys willing to do pro bono work in difficult cases.

Dr. Peter Graham, Ph.D., is a Kansas licensed psychologist and a cofounder of Acumen Assessments and Acumen Institute. Acumen Assessments evaluates licensed professionals' fitness to practice, and Acumen Institute provides remediation and treatment. Acumen performed a fitness-to-practice evaluation with Ayesh. Graham testified Ayesh was functioning at high average to superior level cognitively and did not manifest symptoms of psychological illness, including major depression. At the time of evaluation, Ayesh had several serious chronic conditions:  morbid obesity; working seven

21

days a week for long hours; not eating or sleeping well; and alcohol consumption. He said Ayesh has an obsessive compulsive personality style and that his life becomes so single-mindedly work focused that everything else goes to the wayside. Graham said Ayesh had committed himself to living according to principles revolving around hard work, not engaging in primarily personal or pleasure relationships, and focusing on work in the interests of others. Graham believed Ayesh lacked a sober, objective prospective for protecting his own interests to sustain his ability to be a philanthropist. He said Ayesh was not thinking about his own interests in a reasonable way.

Graham said the Acumen team's impression of the ethics cases was that Ayesh's personal mission impacted his decision making. Graham said Ayesh is cognitively, morally, and intellectually fit to practice; but that something about his personality makes him vulnerable to pursuing work in a client, mission-oriented way that can impact his ethical professional decision making—"putting certain sort of convictions related to his personal mission above really the rules and expectations of the profession." On cross-examination, Graham agreed Ayesh was prone to get into cases like the condominium litigation more than the average lawyer and can get too involved emotionally when he sees an urgency around clients' interests.

Graham said Ayesh should not go back to practice and be left to his own devices because he needs some help. He identified several risk factors to take into account: Ayesh's self-sacrifice, his consequent tendency to not think carefully from time to time, his volume of cases and lack of time, and his penchant for driving head-long toward a self-conceived mission to the exclusion of thinking about his own self-interest. He said Ayesh could be rehabilitated using a systematic approach to helping him address these personal vulnerabilities. Graham said he was familiar with the proposed probation and believed it had the elements the Acumen treatment team believed were called for.

22

When confronted with the dishonest conduct, Graham said the way to effectively supervise that was to focus Ayesh's attention on being clear about what he did wrong, why he did it, and the rationalization he gives for it; to make it clear that none of that is an excuse; and to make it clear it is always Ayesh's duty to use the filter of professional ethics. Graham believed accountability from colleagues is part of that process. He also said Ayesh does not have any severe character pathology—he has not lived a life of self-indulgence or of overall rule-flouting. Graham also said every professional has a capacity for the conduct Ayesh engaged in but concluded it was possible to help right the ship and use better judgment. He predicted Ayesh's risk of reoffending is at the lower end of the spectrum in terms of "all of us" not just people he evaluates.

In response to questioning by hearing panel members, Graham gave seemingly contradictory answers to one line of questioning, saying Ayesh should be monitored by Acumen for the rest of his career, and also that five years' monitoring is usually reasonable and would be for Ayesh. He agreed a benefit to suspension is that it can focus a person's attention and allow them to make changes in the structure of their practice. But he acknowledged suspension has an impact on a professional's financial and emotional well-being and that the issue is not really his "zone" because it is more in the purview of punishment than rehabilitation. Regarding the deeds case, Graham said Ayesh told him he does not routinely sign and notarize clients' signatures and had not done it before.

Ayesh testified he essentially took a vow of poverty at 40 to give away all but expenses for living on a modest, sustenance basis. He estimated he was giving away about $475,000 a year. He said Berg was "satanic, demonic," and he planned to try to get Berg ejected from the condominium development under the covenants. When Berg sued first, Ayesh fashioned this into a counterclaim. Ayesh acknowledged there was a brief discussion about Berg trying to get the CLVCA board on the hook for Frobish's tort, but that Frobish wanted him to represent him, did not see a conflict, and wanted the board to

23

pay for the defense. Ayesh agreed he violated the ethics rules and knew better and should have gotten consent.

Regarding the assertions about Berg, Ayesh acknowledged he attempted to find affidavits to support his allegations. He then commented:

"And herein lies the biggest problem with the criticism saying that I was over-zealous, over the top, trying to embarrass Jerry Berg, going way out of what was needed. The problem is the whole case was about Jerry Berg's conduct and his conduct was so egregious and all the residents had described it in very colorful words and all that. And all I did was adopt their words. And whether it's Kathryn Vratil, Judge Vratil, they were offended by my pleadings. Offended. And I said, I'm sorry you're offended but this case is about this man's conduct and his conduct is offensive. And it's been described very clearly."

As for the Frobish conflict, Ayesh accused Frobish of being untruthful about whether he had seen the answer denying he was in the course of his employment at the time of the physical confrontation with Berg, commenting that "Jon reviewed that even though now he's saying he didn't. But he reviewed and approved. He reviewed and approved every pleading." Ayesh told the panel he had the case settled eight or nine months in, but Frobish "nixe[d] it," and that the only thing more disappointing was Frobish switching on him ten days before trial. Ayesh said he understands now he represented Frobish, the seriousness of the conflict of interest, and that he could not disclose confidential information received from Frobish. But he said the line got blurred because Frobish was publishing everything to the condominium development residents. Ayesh also said his judgment was clouded by his fixation on Berg.

Regarding the deed case, Ayesh said the incidents occurred before the Berg litigation. He said he was working long hours, seven days a week. He said he understands

24

the seriousness of the violations. He believed he had authority to sign the deeds and said it was important to file them right away to prevent a federal tax lien from attaching. He disputed the husband's claim that he did not authorize Ayesh to sign for him, pointing to the letter he sent with the recorded deeds. He said he had no reason to do that and nothing to gain financially from it. He admitted he could have obtained a formal power of attorney from the clients but did not think it was necessary. Ayesh said this was the only occurrence.

The panel recommended a one-year suspension, reasoning as follows:

"American Bar Association Standards for Imposing Lawyer Sanctions

"61.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"62.    Duty Violated. The respondent violated his duty to his client to refrain from conflicts of interest. Additionally, the respondent violated his duty to the public and to the legal profession to maintain his personal integrity. Finally, the respondent violated his duty to the legal system to refrain from actions that result in prejudice to the administration of justice.

"63.    Mental State. The respondent knowingly and intentionally violated his duties.

"64.    Injury. As a result of the respondent's misconduct, the respondent caused actual injury to Mr. Frobish, the legal profession, and the legal system. The respondent caused serious potential injury to C.M. and P.M.

25

"Aggravating and Mitigating Factors

"65.    Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

a.    *Prior Disciplinary Offenses*. The respondent has been previously disciplined on three occasions. The hearing panel gives little weight to the respondent's disciplinary history. See ¶ [66(d)], below.

i.    In 2006, the disciplinary administrator admonished the respondent for violating KRPC 4.2 (communication with person represented by counsel).

ii.    In 2008, the disciplinary administrator admonished the respondent for violating KRPC 1.1 (competence) and KRPC 1.2 (scope of representation).

iii.    In 2013, the respondent successfully completed an attorney diversion agreement, for violating KRPC 1.15 (safeguarding client property).

b.    *Dishonest or Selfish Motive*. While the hearing panel concludes that the respondent's misconduct was motivated by dishonesty and selfishness, the hearing panel gives little weight to this factor. The respondent's actions rather than the motivations for his actions are important to the hearing panel.

i.    In the litigation involving Mr. Frobish and Mr. Berg, the respondent provided false information to the court on multiple occasions to make it appear that a conflict did not exist

26

and that Mr. Frobish invented a conflict as a last ditch effort to thwart the litigation. The respondent knew that a conflict existed at the latest, August, 2013. It is reasonable to conclude that the reason the respondent continued to assert that there was no conflict of interest was based on a dishonest motive to make the court believe that there was no conflict.

ii.     Additionally, it appears that the respondent remained in the litigation because he wanted to be the one to save the day for the community. The respondent's motives for such litigation reflect both his genuine concern for CLVCA residents and his unhealthy compulsion to prevail against Mr. Frobish and Mr. Berg.

iii.     Finally, it appears that the respondent's signing of his clients' names on the two deeds and false notarization of same was a deliberate course of conduct which constituted a 'fraud against the judicial system.' *In re Daugherty*, 285 Kan. 1143, 1156-7, 180 P.3d 536, 547 (2008), citing *In re Thebeau*, 111 Ill.2d 251 (1986).

c.     *A Pattern of Misconduct*. Throughout the litigation involving Mr. Frobish, after being admonished by the courts, the respondent continued to engage in the same types of misconduct. Specifically, the respondent repeatedly disclosed confidential information, the respondent repeatedly engaged in conflicts of interest, the respondent repeatedly provided false information to the courts, and the respondent repeatedly engaged in conduct that prejudiced the administration of justice. Additionally, the respondent signed his clients' name to not one, but two deeds, notarized the signatures on both deeds, and filed both deeds with the Montgomery County Register of Deeds. The hearing panel concludes that the respondent engaged in patterns of

misconduct. The hearing panel is troubled by the ongoing nature of the respondent's misconduct.

   d.    *Multiple Offenses*. The respondent committed multiple rule violations. The respondent violated KRPC 1.2 (scope of representation), 1.6 (confidentiality), 1.7 (conflict of interest), 1.8 (conflict of interest), 1.9 (conflict of interest), 1.16 (termination of representation), 3.1 (meritorious claims and contentions), 3.3 (candor to the tribunal), 4.1 (truthfulness in statements to others), 8.3 (failure to report misconduct), 8.4(c) (engaging in dishonest conduct), and 8.4(d) (engaging in conduct prejudicial to the administration of justice). Accordingly, the hearing panel concludes that the respondent committed multiple offenses. The large number of violations of the rules is a significant aggravating factor.

   e.    *Substantial Experience in the Practice of Law*. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1979. At the time of the misconduct, the respondent has been practicing law for more than thirty-five years. The respondent's substantial experience aggravates the misconduct in this case.

"66.    Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

   a.    Personal or Emotional Problems if Such Misfortunes Have Contributed to the Violations of the Kansas Rules of Professional Conduct. The respondent has an obsessive compulsive personality style. Based on all the evidence presented, the hearing panel concludes that the respondent's personality style contributed to the violations of the rules. The respondent has taken steps to address the challenges of having an obsessive compulsive personality style. The steps the respondent has

taken to address his obsessive compulsive personality style significantly mitigate the misconduct and justify the reduction of what would otherwise be a substantially greater disciplinary recommendation by the hearing panel.

b.      The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions. The respondent fully cooperated with the disciplinary process. Additionally, the respondent admitted the facts and the rule violations in an extensive stipulation. The respondent's level of cooperation is an important mitigating factor.

c.      Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney. The respondent is an active and productive member of the bar of Wichita, Kansas. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by the testimony of judges and lawyers and the many letters received by the hearing panel. In addition to the letters of support, the respondent presented compelling evidence of his extensive philanthropic support of charities and people in need. The hearing panel acknowledges the compelling evidence of the respondent's good character and high esteem of the members of his community.

d.      Remoteness of Prior Offenses. The discipline imposed in 2006, 2008, and 2013, is remote in character and in time to the misconduct in this case. The hearing panel gives the respondent's disciplinary record little weight.

e.      Exceptional Circumstances. Finally, the hearing panel finds the exceptional circumstances surrounding the [CLVCA] litigation to be a significant mitigating factor in its recommendation for discipline.

The hearing panel has rarely seen litigation as protracted and pernicious, as was presented in the underlying litigation involving Mr. Berg and Mr. Frobish. In testimony before the panel, the Honorable [Karen] Humphreys compared the litigation to a wildfire, in that it 'destroy[ed] everything in its path.' The hearing panel finds that the respondent's conduct and admitted violations with respect to the CLVCA litigation, were borne out of his obsessive efforts to navigate exceptionally challenging legal circumstances.

"67.     In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.22     Suspension is generally appropriate when a lawyer knowingly reveals information relating to the representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client.'

'4.31     Disbarment is generally appropriate when a lawyer, without the informed consent of Client(s):

. . . .

(b)     simultaneously represents clients that the lawyer knows have adverse interests with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client; or

(c)     represents a client in a matter substantially related to a matter in which the interests of a present or former client are materially adverse, and knowingly uses information relating to the representation of a client with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client.'

30

'4.32    Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.'

'5.11    Disbarment is generally appropriate when:

. . . .

(b)      a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that serious[ly] adversely reflects on the lawyer's fitness to practice.'

'6.12    Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.'

'6.13    Reprimand is generally appropriate when a lawyer is negligent either in determining whether statements or documents are false or in taking remedial action when material information is being withheld, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.'

"68.    The disciplinary administrator recommended that the respondent's license to practice law be suspended for a period of one year. The disciplinary administrator further recommended that the respondent be required to undergo a reinstatement hearing under Rule 219 prior to consideration of reinstatement.

"69.    The respondent recommended that the respondent's license to practice law be suspended for not less than 90 days and that the respondent be granted probation under the terms and conditions of the proposed plan of probation. (Even though counsel for the respondent argued for a suspension of not less than 90 days, the hearing panel believes that counsel meant to say not more than 90 days.)

*"Discussion of the Respondent's Request for Probation*

"70.    When a respondent requests probation, the hearing panel is required to consider Kan. Sup. Ct. R. 211(g)(3), which provides:

'(3)    The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

(i)    the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least fourteen days prior to the hearing on the Formal Complaint;

(ii)    the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;

> (iii)     the misconduct can be corrected by probation; and
>
> (iv)     placing the Respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.'

"71.     The respondent developed a workable, substantial, and detailed plan of probation. On November 25, 2019, 15 days prior to the hearing, the respondent provided a copy of the proposed plan of probation to the disciplinary administrator and each member of the hearing panel.

"72.     It appears that the respondent took some steps to put the proposed plan of probation into effect prior to the hearing. The proposed supervisor testified about the limited steps [he] had taken to put the plan into place. The respondent testified about how he has implemented some of the terms and conditions included in his proposed plan of probation. However, it is not clear that the respondent put each term and condition of the proposed plan of probation into effect.

"73.     Further, some of the misconduct, in this case, cannot be corrected by probation. Specifically, dishonest conduct cannot be effectively supervised. See *In re Stockwell*, 296 Kan. 860, 868, 295 P.3d 572 (2013) ('Moreover, this court is generally reluctant to grant probation where the misconduct involves fraud or dishonesty because supervision, even the most diligent, often cannot effectively guard against dishonest acts.'). The respondent engaged in dishonest conduct in both cases—he repeatedly violated KRPC 3.3(a)(l) by providing the court with false information and he violated KRPC 8.4(c) when he signed his clients' names to two deeds, notarized the deeds, and filed the forged deeds with the Montgomery County Register of Deeds.

"74.     Finally, placing the respondent on probation is not in the best interests of the legal profession and the citizens of the State of Kansas.

33

"75.    Accordingly, based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously agrees with the disciplinary administrator and recommends that the respondent be suspended for a period of one year. The hearing panel further recommends that prior to reinstatement, the respondent be required to undergo a reinstatement hearing under Rule 219. Finally, should the reinstatement hearing panel propose supervision upon reinstatement, this hearing panel would support such a recommendation."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the panel's findings, and the parties' arguments and determines whether KRPC violations exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see also Supreme Court Rule 211(a)(2) (2021 Kan. S. Ct. R. 259) (a misconduct finding must be established by clear and convincing evidence). "Clear and convincing evidence is 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable.'" *In re Murphy*, 312 Kan. 203, 218, 473 P.3d 886 (2020).

Ayesh was given adequate notice of the formal complaint to which he filed an answer. He was also given adequate notice of the hearing before the panel and the hearing before this court.

Ayesh filed six exceptions, all concerning the recommended discipline. He did not take exception to the panel's factual findings or conclusions of law concerning the misconduct. We address the findings and conclusions first.

"When a respondent does not take exception to a finding it is deemed admitted. But when an exception is taken, the panel's findings are not typically deemed admitted, so the court must determine whether the disputed findings are supported by clear and convincing evidence. In making this determination, the court does not weigh conflicting evidence, assess witness credibility, or redetermine questions of fact. If a disputed finding is supported by clear and convincing evidence, it will not be disturbed. [Citations omitted.]" *In re Hodge*, 307 Kan. 170, 209-10, 407 P.3d 613 (2017).

The stipulations before the hearing panel establish by clear and convincing evidence the charged misconduct violated KRPC 1.2 (scope of representation) (2021 Kan. S. Ct. R. 323); KRPC 1.6 (confidentiality) (2021 Kan. S. Ct. R. 330); KRPC 1.7 (conflict of interest: current clients) (2021 Kan. S. Ct. R. 336); KRPC 1.8 (conflict of interest: current clients) (2021 Kan. S. Ct. R. 345); KRPC 1.9 (conflict of interest: former clients) (2021 Kan. S. Ct. R. 352); KRPC 1.16 (termination of representation) (2021 Kan. S. Ct. R. 372); KRPC 3.1 (meritorious claims and contentions) (2021 Kan. S. Ct. R. 384); KRPC 3.3 (candor to the tribunal) (2021 Kan. S. Ct. R. 385); KRPC 4.1 (truthfulness in statements to others) (2021 Kan. S. Ct. R. 397); KRPC 8.3 (failure to report misconduct) (2021 Kan. S. Ct. R. 426); KRPC 8.4(c) (engaging in dishonest conduct) (2021 Kan. S. Ct. R. 427); and KRPC 8.4(d) (conduct prejudicial to the administration of justice) (2021 Kan. S. Ct. R. 427).

The question remaining is the appropriate discipline.

"In any given case, this court is not bound by the recommendations from the hearing panel or the Disciplinary Administrator. 'Each disciplinary sanction is based on the specific facts and circumstances of the violations and the aggravating and mitigating circumstances presented in the case.' 'Because each case is unique, past sanctions provide little guidance.' [Citations omitted.]" *Hodge*, 307 Kan. at 230.

The court generally looks to the American Bar Association Standards for Imposing Lawyer Sanctions to determine the appropriate sanction. Under that framework, the court considers "four factors in determining punishment:  (1) the ethical duty violated by the lawyer; (2) the lawyer's mental state; (3) the actual or potential injury resulting from the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors." *Hodge*, 307 Kan. at 231.

Ayesh does not challenge the first factor, i.e., the hearing panel's conclusion that he violated his duties to refrain from conflicts of interest, to maintain personal integrity, and to refrain from actions that prejudice the administration of justice; that he knowingly and intentionally violated the duties; or that his misconduct caused actual injury to Frobish, serious potential injury to the married couple, or actual injury to the legal profession and legal system.

Ayesh's exceptions focus on six aspects of the panel's application of factors two (lawyer's mental state) and four (existence of aggravating or mitigating circumstances). He first questions the panel's finding that his misconduct was motivated by dishonesty and selfishness. His remaining focus is on:  the weight placed on the personal and emotional problems that contributed to the misconduct and his efforts to address them; the weight placed on the evidence of his good character; the panel's conclusion that the misconduct could not be corrected by probation; the panel's decision that probation is not in the best interest of the legal profession; and the panel's ultimate recommendation for a year's suspension.

Conceptually, these exceptions relate to two separate points within our framework for determining what discipline is appropriate. First, was there sufficient evidence to establish Ayesh's misconduct was motivated by selfishness or dishonesty? And second, what is the appropriate discipline under the four factors for determining punishment?

36

Ayesh first argues the panel's conclusion that his misconduct was accompanied by selfish or dishonest motive was not supported by clear and convincing evidence. He argues that the evidence established his only motivation was to help his clients; that he did not have a dishonest motive at the time he made his multiple false representations about the conflict of interest in the condominium case; and that his forgery of client signatures, false notarization, and filing deeds was motivated only by his clients' best interests. Even so, the panel assigned little weight to this factor.

"Unlike the standard for proving attorney misconduct, the panel does not need clear and convincing evidence to consider aggravating and mitigating factors." *In re Hall*, 304 Kan. 999, 1013, 377 P.3d 1149 (2016) (holding panel did not err considering respondent's voluntary license surrender as mitigating factor since there was some evidence of respondent's wish to voluntarily suspend). Nonetheless, "some evidence of those circumstances still must be presented for weighing." 304 Kan. at 1014.

We hold there was evidence to support the panel's finding that Ayesh's conduct was motivated by selfishness and dishonesty. Paragraph 60 of the panel's hearing report details pleadings Ayesh filed in November 2014 concerning Frobish's pursuit of sanctions against him—including his removal from the case and the costs of the proceedings. In his effort to defeat those requests and their negative ramifications for him personally, Ayesh employed improper methods including name calling, false representations about the conflict, and unsupported allegations about Frobish. These circumstances provided a logical basis for concluding at least some of Ayesh's misconduct was self-serving. See *In re Kline*, 298 Kan. 96, 222, 311 P.3d 321 (2013) (former attorney general acted with a selfish motive when the wrongful public disclosure of sealed documents was motivated by a desire to help "'others'" understand his position on a matter; and that other wrongful

conduct was designed to "protect himself from perceived ridicule and unfavorable public scrutiny and cull favor with the public for his cause").

There was also ample evidence that misconduct in both the CLVCA and deeds matters was motivated by dishonesty. Despite Ayesh's claim his dishonesty in the condominium case was unintentional, that cannot be reconciled with several facts in the record. He stipulated the misconduct was knowing and intentional. And the panel found he "knew that a conflict existed at the latest, August, 2013," when Frobish refused to assist Ayesh in demonstrating he was not acting within the scope of his employment for the purposes of the summary judgment motion. Ayesh stipulated he was "[a]t this point . . . on notice that there was a conflict." All the deceptive pleadings—ten in total— were filed after that date.

Ayesh also points out he did not receive any personal gain from his misconduct in the deeds complaint. And he seizes on the panel's belief that the recording of falsely signed and notarized deeds was a "fraud against the judicial system" and its attendant citations to *In re Daugherty*, 285 Kan. 1143, 1153, 180 P.3d 536 (2008), and *In re Thebeau*, 111 Ill. 2d 251, 489 N.E.2d 877 (1986). Ayesh distinguishes *Daugherty* on the ground that it involved dishonesty undertaken for personal gain. See *Daugherty*, 285 Kan. at 1153 (attorney made false statements supporting his own bankruptcy petition). He distinguishes *Thebeau* on the basis it involved "a continual course of conduct with respect to forged documents" and that the respondent in that case "did not present any mitigating facts or circumstances, nor did he present any character or reputation testimony." Instead, he argues his circumstances are more analogous to *In re Roy*, 261 Kan. 999, 933 P.2d 662 (1997), or *In re Grant*, 262 Kan. 269, 936 P.2d 1360 (1997), in which attorneys were censured for filing documents on which they forged signatures. We disagree.

Neither *Roy* nor *Grant* are instructive on whether there was evidence to support the panel's finding that Ayesh's misconduct in the deeds case was motivated by dishonesty. The hearing panel in *Roy* found the respondent did not act with a dishonest or selfish motive when he forged his client's signatures on a bankruptcy petition and then filed it to stop a sheriff's sale. *Roy*, 261 Kan. at 999-1000. But neither party took exception to the hearing panel's finding on appeal. In *Grant*, the hearing panel found the attorney's decision to forge a testator's signature on a will submitted for probate was dishonest, but not selfish. *Grant*, 262 Kan. at 270. Two justices dissented because they would have imposed suspension. 262 Kan. at 273-74.

Here, the act itself is evidence of a dishonest motive. Ayesh contends he had authority from his clients to sign the deeds on their behalf. But even if that were true, Ayesh notarized the signatures on the deeds, falsely acknowledging both personally executed the documents, and had them filed. Such acknowledgements are routinely considered prima facie proof of a deed's validity and the signer's identity. See 91 Am. Jur. Proof of Facts 3d 345, § 1 (2006); *In re Adoption of X.J.A.*, 284 Kan. 853, 872, 166 P.3d 396 (2007). Having personally forged his clients' signatures on the real estate deeds, Ayesh knew his clients did not sign them and then hid that fact by using his office as a notary to falsely certify otherwise. He then recorded falsified evidence of the conveyance to defeat a tax lien he believed impending. In addition, Ayesh denied signing the deeds when confronted by his client's divorce attorney. The panel reasonably concluded Ayesh had a dishonest motive.

We hold the panel properly concluded that a selfish and dishonest motive existed and appropriately considered this as an aggravating factor.

DISCIPLINE

Ayesh presents his remaining five exceptions as separate issues: two going to the weight that should be placed on his mitigation evidence, two going to whether probation is appropriate, and the final one arguing generally that the recommended one-year suspension is too harsh. But because the court is not bound by the panel's discipline recommendation, the issue here is whether the court independently considers Ayesh's arguments persuasive enough to impose the lesser discipline he seeks. See *In re Biscanin*, 305 Kan. 1212, 1229, 390 P.3d 886 (2017) ("The recommendations of the hearing panel and office of the Disciplinary Administrator are advisory only and do not prevent us from imposing greater or lesser sanctions."); *In re Barker*, 299 Kan. 158, 167, 321 P.3d 767 (2014) ("The panel must consider the evidence presented as to aggravating and mitigating circumstances and determine the weight to be assigned to each in arriving at an appropriate discipline. On appeal, this court determines whether it agrees with the panel's findings regarding aggravating and mitigating circumstances.").

Viewed from that perspective, our question is whether Ayesh should be placed on probation rather than suspended from the practice of law. Under the ABA standards, "[p]robation is a sanction that allows a lawyer to practice law under specified conditions. Probation can be imposed alone or in conjunction with a reprimand, an admonition or immediately following a suspension. Probation can also be imposed as a condition of readmission or reinstatement." ABA Standards for Imposing Lawyer Sanctions, § 2.7. Ayesh seeks probation in lieu of suspension or immediately following a suspension not exceeding 90 days.

Ayesh argues probation will correct his past dishonest conduct, will deter future misconduct, and be in the legal profession's best interests. He contends his past dishonest conduct "[was] motivated by his obsessive devotion to his clients' causes," which caused

40

him to lose "his sense of objectiveness and caution." He argues now he has taken "a step back and reflect[ed] on the situations," he acknowledges his "devotion" to his clients "clouded his better judgment." Ayesh also contends there is "no evidence that [his] actions were driven by greed or selfish motives" and that the hearing testimony established his inability to practice law would be a loss to the bar; would negatively impact his clients; would harm his staff; and would hinder his ability to continue receiving treatment.

In the end, Ayesh believes he has taken the necessary steps to prevent the misconduct from occurring again by altering his lifestyle and caseload. And, he argues, his punishment should reflect his view that the mitigating factors both "provide an understandable basis behind [his] pattern of misconduct and number of violations," and "far outweigh the aggravating factors." The Disciplinary Administrator contends probation alone is inappropriate because Ayesh's client-protection motivation did not justify the dishonest conduct.

Generally, we are "reluctant to grant probation where the misconduct involves fraud or dishonesty because supervision, even the most diligent, often cannot effectively guard against dishonest acts." *In re Stockwell*, 296 Kan. 860, 868, 295 P.3d 572 (2013). Under the ABA standards the panel cited, a sanction of at least suspension would be a reasonable discipline for the misconduct in this case after weighing the competing aggravating and mitigating circumstances.

"The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to properly discharge their professional duties to clients, the public, the legal system, and the legal profession." ABA Standards for Imposing Lawyer Sanctions, § 1.1. We readily acknowledge Ayesh presented evidence tending to demonstrate the

exceptional circumstances attendant to his misconduct in the condominium litigation and his otherwise exemplary character. And in Ayesh's view, in recommending suspension and declining to recommend probation the panel placed insufficient weight on the personal and emotional problems contributing to the misconduct and affecting his good character. But there are other considerations.

Admittedly, the mitigation evidence is weighty, but it is offset by significant aggravating factors, namely that Ayesh persisted in a pattern of misconduct involving many rule violations over a two-year period, despite court admonishments, warnings of disciplinary violations from Frobish, and court-imposed sanctions. Also, a significant portion of Ayesh's mitigation case appeared to be aimed at deflecting blame by putting Berg and Frobish's character in issue. And regardless of what other health problems Ayesh may have been suffering, Graham testified Ayesh is cognitively, intellectually, and morally fit to practice law, and that Ayesh is capable of thinking ethically. Drawing from Graham's conclusions, Ayesh argues to us that his professional judgment was compromised by his "moral feeling and tendency to go the extra mile for others in self-defeating ways."

But the sustained vitriol Ayesh participated in or unleashed on his own accord over such a lengthy period—at friend, foe, and neutral alike—is distressing. So is the dishonesty accompanying his misconduct and permeating his actions in the deeds case. A myopic dedication to helping others neither explains nor diminishes the pervasive lack of civility and candor displayed in the stipulated facts.

We conclude suspension with a three-year term is the appropriate discipline. In arriving at this, we have considered the aggravating and mitigating circumstances described above, as well as the clear and convincing evidence supporting the panel's findings and conclusions. That said, the court is amenable to staying the suspension after

the first six months so long as Ayesh adheres to a probation plan approved by the Disciplinary Administrator's office that extends for the remaining suspension period. And after successfully completing probation, or at the end of the suspension, we conclude a reinstatement hearing is also necessary to ensure Ayesh is capable of practicing law without further supervision.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Mark G. Ayesh be and he is hereby suspended from the practice of law in the state of Kansas in accordance with Supreme Court Rule 225(a)(3) (2021 Kan. S. Ct. R. 275) for three years as of the date of this opinion.

IT IS FURTHER ORDERED that the above suspension will be stayed after the first six months provided respondent enters into a probation plan approved by the Disciplinary Administrator's office that extends for the remaining suspension period. Approval of a probation plan by that office is required before any stay can commence.

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 231 (2021 Kan. S. Ct. R. 286) (notice to clients, opposing counsel, and courts of record following suspension).

IT IS FURTHER ORDERED that respondent comply with Supreme Court Rule 232 (2021 Kan. S. Ct. R. 287), including undergoing a reinstatement hearing after the three-year suspension term ends. Additional conditions for reinstatement may be explored by the Disciplinary Administrator's office, a reinstatement panel, or the court during any reinstatement process.

43

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to respondent and that this opinion be published in the official Kansas Reports.